```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF LOUISIANA
 2                            LAFAYETTE DIVISION


 3

     UNITED STATES OF AMERICA,          )
 4                                      )
                        Plaintiff,      )
 5                                      )
          vs.                           )    Case No.: 2:17-cr-324
 6                                      )
     RYAN KEITH TAYLOR,                 )
 7                                      )
                        Defendant.      )
 8   _____)

 9

10                      TRANSCRIPT OF SENTENCING
                    BEFORE THE HONORABLE JAY C. ZAINEY
11                     UNITED STATES DISTRICT JUDGE

12               Monday, September 24, 2018; 9:56 a.m.
                          LAFAYETTE, LOUISIANA
13

     APPEARANCES OF COUNSEL:
14

     FOR THE PLAINTIFF:
15

          David C. Joseph
16        Daniel J. McCoy
          OFFICE OF THE U.S. ATTORNEY (LAF)
17        800 Lafayette Street, Suite 2100
          Lafayette, Louisiana 70501
18

     FOR THE DEFENDANT:
19

          Wayne J. Blanchard
20        OFFICE OF THE FEDERAL PUBLIC DEFENDER (LAF)
          102 Versailles Boulevard, Suite
21        Lafayette, Louisiana 70501

22               *******************************

23                      GAYLE WEAR, RPR, CRR
                    Federal Official Court Reporter
24                       800 Lafayette Street
                     Lafayette, Louisiana 70501
25                          337.593.5222
```

1

2                              I N D E X

3       PROCEEDINGS:                                       PAGE

4       GOVERNMENT'S WITNESSES:

5       BRANDON MICHAEL ZALEWSKI

6            Direct examination by Mr. McCoy               12

7
        JOSHUA FRANCIS FARBRO
8
             Direct examination by Mr. McCoy              21
9            Cross-examination by Mr. Blanchard           41

10
                              *    *    *
11

12                          E X H I B I T S

13      DEFENDANT'S
        EXHIBITS                 MARKED              ADMITTED
14
          1                        44                  47
15        2                        44                  47
          3                        45                  47
16        4                        46                  47
          5                        47                  47
17

18

19                            *    *    *

20

21

22

23

24

25

```
 1    September 24, 2018                              9:56 a.m.

 2                         ---o0o---

 3                   P R O C E E D I N G S

 4                         ---o0o---

 5         THE COURT:  Good morning.  Please have a seat.

 6    Let's take up the sentencing of United States versus Ryan

 7    Keith Taylor, 17-324.

 8              Counsel, identify yourself for the record, please.

 9              MR. JOSEPH:  Good morning, Your Honor.  David

10    Joseph, on behalf of the United States, along with Dan McCoy

11    and FBI Special Agent Randy Dietz.

12              THE COURT:  Good morning.  Thank you.

13              MR. BLANCHARD:  Good morning, Your Honor.  Wayne

14    Blanchard, for Ryan Taylor.

15              THE COURT:  Thank you.  And where is Mr. Taylor?

16              MR. BLANCHARD:  He's coming out, Your Honor.

17         (Whereupon, the defendant enters the courtroom.)

18              THE COURT:  Thank you.  You can have a seat.

19              MR. BLANCHARD:  Thank you.

20              THE COURT:  Are you Ryan Keith Taylor?

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  Okay.  Why don't you both stand up,

23    then and --

24              MR. BLANCHARD:  Do you want us at the podium?

25              THE COURT:  Yeah, please.
```

1          MR. BLANCHARD:  Okay.

2          THE COURT:  Mr. Taylor, on June the 11th, 2018, you

3    entered a plea of guilty to Count 1 of the Indictment

4    charging you with use of a chemical weapon, in violation of

5    Title 18 § 229(a)(1) and 2929A(a)(1).

6          Is that correct, counsel?

7          MR. BLANCHARD:  Yes, Your Honor.

8          THE COURT:  The Court hereby accepts and adjudges

9    that offense.

10         Mr. Taylor, sir, we've now reached a stage in the

11   proceedings where it's my duty to address several questions

12   to you, to your lawyer, and also to the lawyer for the

13   government.

14         Sir, have you had the opportunity to review the

15   presentence report with your lawyer?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Do you have any objections as to the

18   facts that are contained in the presentence report?

19         THE DEFENDANT:  I do not, Your Honor.

20         THE COURT:  Okay.  And, counsel, do you have any

21   objections as to the probation officer's calculation of the

22   guidelines?

23         MR. BLANCHARD:  No, Your Honor.

24         THE COURT:  Okay.  I understand the government does

25   have objections.  Is that correct?

1          MR. MCCOY:  That's correct, Your Honor.  Dan McCoy,

2    on behalf of United States.

3          As previously filed within the record, we did have

4    an objection as to the admission of a two-level enhancement

5    under 2M6.1(b)(1).  The government's arguments are clearly

6    laid out in its -- in its letter to the Court and to

7    Probation, and we would again stand by our argument.

8          THE COURT:  I've read it.

9          Mr. Blanchard, what is your response?

10          MR. BLANCHARD:  Well, Your Honor, my response is

11    basically what I had responded to the Probation Office, to

12    Ms. Myers.  I think it simply does not apply.  The language

13    refers to whether or not the device was designed or intended

14    to cause death or serious bodily injury.  I think the facts

15    of the case are clear that that's not what went on here, Your

16    Honor.

17          Again, there was an extensive investigation into

18    this matter.  There was -- there were multiple electronic

19    devices that were searched.  There's no indication that he

20    had any intent to harm anyone with this, Your Honor.  It was

21    set off in a rural -- a very rural area, and it was not in a

22    place, say, a crowded theater or anything like that.  It was

23    somewhere where it was very unlikely that it was -- would

24    have caused harm.

25          What happened, unfortunately, to the victims in

1    this matter is why it's illegal to do this.  But it's clear

2    that it was not intended or designed for that purpose, Your

3    Honor.

4            THE COURT:  All right.  Thank you.  I've reviewed

5    it.  I've reviewed the government's motion.  I've reviewed

6    your response, your argument, as well.  I agree with the

7    government.  I feel that the government's objection was that

8    the presentence investigation report omitted the two-level

9    enhancement under the specific offense characteristics.  I do

10   find merit to the government's objections to the admission of

11   a two-level enhancement under specific offense

12   characteristics provided under United States Sentencing

13   Guidelines § 2M6.1(b)(1).

14           Even though chlorine is not a toxic chemical, it's

15   listed under Schedule 1 of the Annex on Chemicals to the

16   Chemical Weapons Convention.  It is a toxic chemical as

17   defined in 18 United States Code 229F(8)(A), because it can,

18   and I quote, "cause death, or temporary incapacitation or

19   harm to humans or animals," quote.

20           Because the weapon used in this offense meets the

21   definition of mass destruction, as defined in 28 U.S.C.

22   2232(a)(c)(B), an additional 2 level offense characteristic

23   is added to the calculations, making the total offense level

24   of 31, increasing the advisory guideline range from 87 to

25   108 months to 108 to 135 months.

1          Mr. Blanchard, I will note your objection for the

2    record, sir.

3          MR. BLANCHARD:  Thank you, Your Honor.

4          THE COURT:  Any other objections by either party?

5          MR. MCCOY:  None from the United States, sir.

6          MR. BLANCHARD:  No, Your Honor.

7          THE COURT:  Thank you.

8          The Court adopts the undisputed factual statements

9    and guideline applications as contained in the presentence

10   report as amended by this Court.  And as to the controverted

11   factual statements and guideline applications, I adopt the

12   position of the probation officer as stated in the addendum,

13   except for purposes of the calculation.

14         Therefore, the calculations are as follows:  Total

15   offense level is a 31, with a criminal history category of I.

16   The guideline imprisonment range is from 108 to 135 months

17   imprisonment.  Supervised release term of up to five years.

18   There has been a request for restitution in the amount of

19   $6919.  The fine range is from $30,000 to $250,000, with a

20   special assessment of $100.

21         Mr. Blanchard, do you know of any reason why this

22   Court should not now proceed with the imposition of sentence?

23         MR. BLANCHARD:  No, Your Honor.  We're ready to

24   proceed.

25         THE COURT:  All right, sir.  Do you have any

1    witnesses?  Or would your client like to make a statement?

2              MR. BLANCHARD:  He would like to make a statement,

3    Your Honor.

4              THE COURT:  Yes, sir.  Go ahead, please.

5              THE DEFENDANT:  Your Honor, thank you for allowing

6    me to address your court.  And for the longest time, I was

7    without words in this matter, but I'm going to try as hard as

8    I can to bring light to what actually happened.

9              Basically, Your Honor, the morning that all of this

10   started, I had just returned from Lake Charles at roughly

11   5:00 a.m., and I was nearing a four-day holiday weekend, so I

12   was irresponsibly stuck in party mode.  And I decided after a

13   few beers that morning to have a little fun out in the woods

14   before work out at the free growth hang-out range.

15             But my time was unexpectedly interrupted because I

16   thought I was alone out there.  I saw Sergeant Murphy coming

17   toward me, and immediately, I stopped.  We had a

18   conversation.  And then shortly after that, I had left.  And,

19   honestly, I thought nothing of this, Your Honor.  I did not

20   at any point in time ever think that I had broken the law or

21   anything even close to this could have possibly happened,

22   Your Honor.  This was never my intention.

23             And as far as for my two victims, Your Honor, these

24   two affect me more than anything else ever has in my entire

25   life, Your Honor.  Even stuff I've had to deal with from

1    overseas, dealing with stuff that I've been working with

2    counselors for the last year, those two got hurt because of

3    me, Your Honor, and for that I have the absolute utmost

4    remorse for this.  At no point during this did I ever intend

5    to have even caused anything similar to this.

6              And, Your Honor, I do realize that my actions were

7    absolutely reckless, irresponsible, and could have caused a

8    lot of harm to a lot more people, should there have been more

9    people out there.  But I don't wish to do anything even

10   similar to what I've been accused of, and I don't have any

11   desire to do anything similar any time near the future.

12             And the very fact that I did this way out in the

13   woods where I believed I was alone, should exemplify my

14   intentions in this stuff.  I was not intending to hurt

15   anybody.  I was reckless, irresponsible, and doing

16   technically legal things, Your Honor.  And I've definitely

17   learned a lot over these last 17 months.

18             I've already spent 17 months incarcerated, lost a

19   very promising career where I was about to be a sergeant, and

20   I've also lost all desire for any kind of reckless behavior

21   and immature stuff that I previously exhibited.  I've taken a

22   lot of time to think, Your Honor.  And this entire thing has

23   changed me 100 percent, Your Honor.

24             I've done a lot of work to improve myself as a

25   person.  I've gained 40 classes.  And most of all, I've

1    learned that I want nothing to do with any kind of criminal

2    or incarcerated living.  And during my 17 months of

3    incarceration, I learned where I do not want to be, and that

4    is most of all anybody who would ever do anything like this

5    to harm somebody.

6              This has also helped me identify changes that I

7    need to make in my own life, Your Honor, and it got me free

8    of my alcohol addiction.  It ed -- it educated me in both

9    criminal and addictive thinking that I've now learned to

10   address in myself.

11             As for the victims that were both permanently

12   changed that day, I'm at a loss for words of how bad I feel

13   for that, Your Honor.  This entire thing started off what I

14   completely blew off as irrelevant and just part of my average

15   day, Your Honor.  I never once thought that any of this could

16   have happened.

17             The fact that I caused Mr. Farbro the severity of

18   injuries, it bothers me more than anything I've ever seen in

19   my entire life.  And, Your Honor, I hope that you can see

20   that I'm not a bad person that would ever intentionally do

21   this to somebody.  And most of all, I can't express how sorry

22   I am to the victims, and I cannot wait to get past this phase

23   of my life so I can start paying them back, Your Honor.

24             THE COURT:  Why don't you turn say round and

25   apologize to them.  Are they here?  Are they here in court?

1    Where are they?  Could you stand, please?

2         THE DEFENDANT:  Gentlemen, I know I caused a

3    problem for you guys.  I had no intention of ever doing this.

4    And by the time that you guys got out there to investigate

5    this stuff -- I've gone over the scenario in my head -- I

6    thought everything that could have possibly gone wrong would

7    have aired out, everything would have been done, and I

8    continue just going on through my life.

9         But the fact that you two gentlemen were hurt, it

10   honestly bothers me more than anything else ever has in my

11   entire life.  And I can't express how sorry I am for this.

12        As far as the civil suits, I'm not even going to

13   try to fight that, gentlemen.  I'm going to pay you what

14   you're due because I changed your lives in ways that I never

15   would have thought even possible.  I'm really sorry.

16        THE COURT:  All right.  Thank you, Mr. Taylor.

17   Anything further?

18        THE DEFENDANT:  Nothing further, Your Honor.

19        THE COURT:  All right.  Thank you.

20        Mr. McCoy, do you have any witnesses?

21        MR. MCCOY:  I do, Your Honor.  I have two

22   witnesses.  I would first like to call Brandon Zalewski.

23        THE COURT:  Mr. Blanchard, why don't you and your

24   client have a seat.

25        MR. BLANCHARD:  Yes, Your Honor.

```
 1                    (Discussion held off the record.)

 2              THE COURTROOM DEPUTY:  Good morning.  Please raise

 3   your right hand.

 4              Do you solemnly swear that the testimony you will

 5   give in this case will be the truth, the whole truth, and

 6   nothing but the truth, so help you God.

 7              THE WITNESS:  Yes, ma'am.

 8              THE COURTROOM DEPUTY:  Have a seat, please.

 9                    BRANDON MICHAEL ZALEWSKI,

10       first having been duly sworn by the Courtroom Deputy,

11              testifies under oath as follows:

12                       DIRECT EXAMINATION

13   BY MR. MCCOY:

14   Q.    Brandon, can you please state your name and spell your

15   last for the record?

16   A.    Brandon Michael Zalewski.  Z-A-L-E-W-S-K-I.

17   Q.    Where are you from, Brandon?

18   A.    I'm from West Palm Beach, Florida.

19   Q.    Now, you were in the Army, stationed at Ft. Polk;

20   correct?

21   A.    Yes, sir.

22   Q.    And you were there in -- on April 12th of 2017?

23   A.    Yes, sir.

24   Q.    How long was your total service for the US Army?

25   A.    Seven years, sir.
```

1    Q.    And can you tell the judge, what was your MOS or your
2    military occupational specialty?
3    A.    I was a 31 Bravo, which was military police officer.
4    And then I went to a special schooling to become an
5    investigator.
6    Q.    Now, were you serving as a military police officer or
7    investigator on the date that the activities occurred?
8    A.    Yes, sir.
9    Q.    Okay.  I want to track back a little bit before we get
10   into the specifics on that instance.
11           Can you let the judge know, did you have any
12   overseas deployments?
13   A.    Yes, sir.
14   Q.    And let him -- can you tell him where they were and for
15   how long?
16   A.    I was in Germany for three years.  And while I was in
17   Germany I went to Afghanistan and Africa.
18   Q.    And during your time in the Army, did you receive any
19   awards?  Any decorations?  Medals?
20   A.    Yes, sir.
21   Q.    Okay.  And during your seven years in the Army, what
22   was your final rank?
23   A.    Sergeant.
24   Q.    Okay.  Now, you are medically retired from the US Army;
25   correct?

1    A.    Yes, sir.

2    Q.    And in terms of the events in question, did you get --

3    what, if any, disability rating did you get?

4    A.    I did get -- I got 50 percent for PTSD, but I also, for

5    like my skin conditions, and then for my trouble breathing, I

6    got rated at a 0 percent.

7    Q.    Okay.  So and that means to the judge that the Veterans

8    Administration will be able to treat you for any of those

9    issues that would -- could possibly occur later on in your

10   life?

11   A.    Yes, sir.

12   Q.    All right.  Now, tell the judge, on April 12th, 2017,

13   what were your specific duties that day?

14   A.    My specific duty was that -- that day was I was the

15   odd-duty investigator.  I was being overseen by Investigator

16   Farbro, just because I was still within the training phase.

17   And it was like my first day, but I was being watched what I

18   was doing.

19   Q.    Okay.  And so tell him what happened.  What was your --

20   what was your role in the investigation that day?

21   A.    My role in the investigation is the day started out

22   when we heard about the incident.  Myself, Farbro, and our

23   boss, Mike George, we were all sitting in the mobile -- or

24   not the mobile, the command center, and we were going over

25   videos, hearing about the events.

```
 1              And that's when we all decided that we would send

 2   Investigator Farbro out to the actual scene of the crime, and

 3   that I was going to go and find the subject, and figure out

 4   what was going on and try to see if I could locate any more

 5   harmful items.

 6   Q.    And were one of those reasons that Mr. Farbro was sent

 7   out to the training areas is that he had more familiarity

 8   with that area?

 9   A.    Yes, sir.

10   Q.    Okay.  Now, you did locate the suspected vehicle at

11   Ft. Polk; correct?

12   A.    Yes, sir.

13   Q.    Kind of explain to the judge where that area was in

14   relation to the post.

15   A.    Okay.  So there's the -- I guess you could say it's the

16   library, slash, education center.  So there's soldiers there.

17   I mean, probably hundreds of soldiers at a time.  That's

18   where they go to get signed up for college and, you know, do

19   all that type of thing.

20              Right down the street, there is a school; it's a

21   child development center.  And then across from there, there

22   is a -- the commissary, which is where we do all of our food

23   shopping.

24   Q.    Okay.  So we see -- you see the vehicle.

25   A.    Yes, sir.
```

1    Q.    And then do you approach it?

2    A.    Yes, sir.  So I saw the vehicle, and I radioed up that

3    the vehicle was there.  I approached the vehicle and looked

4    through the driver's side window where I noticed a gun

5    between the driver's seat and the -- in between the driver's

6    seat and the center console.

7    Q.    Okay.  And what happens next?

8    A.    That is when I turned around and I saw Ryan Taylor, and

9    I asked him if that's who he was and if that he was the

10   operator of the vehicle, in which he stated to me yes.

11   That's when I placed him under arrest.

12   Q.    Okay.  Did you search the vehicle?

13   A.    Yes, sir.

14   Q.    Tell the judge what happened when you were searching

15   the vehicle.

16   A.    While searching the vehicle -- myself and several other

17   officers, we began to look through the vehicle, when I

18   started to feel an itchiness going through my throat, and I

19   didn't really think too much of it.  There was the odor of

20   chlorine throughout the entire vehicle.

21         While going through the vehicle, I also found more

22   loaded magazines, and also more chlorine tabs, and beer

23   bottles.  Also, in the back seat or in the trunk there was a

24   bag that looked like it contained like the -- what had

25   exploded and kind of like was cleaned up and put into a bag

1    which we opened, not knowing exactly what was going on at the

2    time, which is when we got a really strong odor of a

3    chlorine.

4              We continued to search the vehicle, when we found a

5    protein bottle top.  When we lifted the protein bottle top is

6    when we noticed that it was melting the carpet on the floor.

7    Q.    Okay.  And shortly thereafter, did -- were you

8    contacted, basically, by the hazardous material control?

9    A.    So we were standing out there.  And my boss, Mike

10   George, came flying up in his patrol car and telling us to

11   get away from the vehicle, that there -- it is an extreme

12   hazard, when the fire department shortly later arrived on

13   scene.  And we were sprayed down with fire hoses and

14   transported to the hospital.

15   Q.    So that was like a decon -- decontamination process.

16   A.    Yes, sir.

17   Q.    All right.  So you go to the hospital.  At Ft. Polk

18   they call that BJACH; right?

19   A.    Yes, sir.

20   Q.    The BJAC Hospital?  So at BJACH, you're seen by

21   treating medical professionals?

22   A.    Yes, sir.

23   Q.    Okay.  And then you're released; correct?

24   A.    Yes, sir.

25   Q.    All right.  Did you subsequently go back to the

1  hospital again?

2  A.    Yes, sir.  A few hours later, I was at the police

3  station when I started to feel as if somebody had a hand on

4  the back of my -- on my back, and then on my chest, and just

5  were squeezing my chest together.  It started to become

6  really hard to breathe.  I started to panic.  My throat

7  started to feel like it was swelling.  So that's when myself

8  and several other people decided to go back to the hospital.

9  Q.    So I guess in conclusion, Brandon, can you just tell

10  the judge what, if any, effects this incident has had on your

11  life?  What was the impact on it?

12  A.    So the impact is just the fact that I still can't do a

13  lot of exercise, running, playing with my kids for too long.

14  You know, it makes it hard to breathe.  As a kid, growing up,

15  all I ever wanted to do was become an FBI agent or a marshal.

16  And with the diagnosis of PTSD and being on medicine, it's

17  not within reach anymore.

18            THE COURT:  What medicine are you on right now?

19            THE WITNESS:  It's -- I believe it's called

20  Cymbalta.

21            THE COURT:  This is for the PTSD?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  Are you taking anything at all for the

24  skin?

25            THE WITNESS:  I was on a medical steroid that

1    was -- it's like a lotion.  I don't know the name of it, Your

2    Honor.

3            THE COURT:  Okay.

4            THE WITNESS:  Then there is this like, you know --

5    there is a thought of just, yeah, Investigator Farbro knew

6    the area of where he was going where the bomb was set off,

7    but I have to live with the decision that we all made of

8    sending him out there and knowing how affected he is, and I

9    can't sleep at night some nights.  It's one of those things.

10           Like he was a really close friend of mine at this

11   point.  And knowing that, you know, he could have lost his

12   life and is still struggling every day of his life is really

13   something hard to live with.

14           MR. MCCOY:  I have no further questions, Your

15   Honor.  I tender.

16           MR. BLANCHARD:  No questions, Your Honor.

17           THE COURT:  How far away is the Mona Lisa

18   Apartments from where this took place?

19           THE WITNESS:  Mona Lisa?

20           THE COURT:  Are you familiar with the Mona Lisa

21   Apartments?

22           THE WITNESS:  I want to say it's right outside the

23   main gate.  I would say it's probably about ten minutes, Your

24   Honor.

25           THE COURT:  Is it a walk or drive?

```
 1                    THE WITNESS:  Drive, Your Honor.
 2                    THE COURT:  It's a few miles away, then?
 3                    THE WITNESS:  Yes, Your Honor, because you go into
 4    the gate -- it's about -- I would say, about a mile into the
 5    gate is where the library is.  And about maybe a mile or a
 6    mile and a half out the gate is where the apartments are.
 7    It's about two -- roughly about two miles, I would say.
 8                    THE COURT:  Okay.  And you mentioned about the
 9    commissary.  You mentioned about the children's school.  How
10    far away were they from where the bomb was detonated?
11                    THE WITNESS:  Within a hundred yards, Your Honor.
12                    MR. MCCOY:  Brandon, that's where the vehicle was.
13                    THE WITNESS:  Yes, Your Honor.
14                    MR. MCCOY:  So where the -- where the detonation
15    was was out in a training -- training range --
16                    THE WITNESS:  Right.
17                    MR. MCCOY:  -- correct?
18                    THE COURT:  And how far was that away?
19                    THE WITNESS:  Um...
20                    THE COURT:  About.
21                    THE WITNESS:  Probably about a half a mile to a
22    mile.
23                    THE COURT:  Okay.
24                    All right.  Any other questions?
25                    MR. MCCOY:  No, Your Honor.
```

1          THE COURT:  Mr. Blanchard, any other questions?

2          MR. BLANCHARD:  No, Your Honor.

3          THE COURT:  Thank you, sir.  You may step down.

4          Call your next witness.

5          MR. MCCOY:  Yes, sir.  Your Honor, we call Joshua

6     Farbro at this time.

7          THE COURTROOM DEPUTY:  Good morning.  You can go

8     have a seat.  Please raise your right hand.

9          Do you solemnly swear that the testimony you will

10    give in this case will be the truth, the whole truth, and

11    nothing but the truth, so help you God?

12         THE WITNESS:  So help me God.  Yes, ma'am.

13         THE COURTROOM DEPUTY:  You can have a seat.

14         THE WITNESS:  Thank you.

15                      DIRECT EXAMINATION

16    BY MR. MCCOY:

17    Q.   Okay, Josh.  I'm going to ask the same question for

18    you.  Can you please state your name and spell your last for

19    the record.

20    A.   Joshua Francis Farbro, F-A-R-B-R-O.

21    Q.   And, Josh, if you need some water, there are glasses

22    and fresh water right there.

23         Josh, where are you from?

24    A.   Wichita, Kansas.

25    Q.   And what city did you come into the Army from?

1   A.     Kansas City.

2   Q.     Okay.  And you were stationed at Ft. Polk?

3   A.     Yes, sir.  Since 2011.

4   Q.     Okay.  So let the judge know, your MOS was also

5   military police?

6   A.     Yes.  I was a 31 Bravo, Your Honor, but also I

7   specialized in PSD, which is Protected Service Detail.  I was

8   also a team leader and the head sniper on the SWAT team.

9   Also, I taught a lot of the courses on our military academy,

10  as well.  We call that LE certification.  Kind of like the

11  military's version of the academy, once you get to your

12  station.  I was also an advanced marksman trainer, and pretty

13  well known around the post, Your Honor.

14  Q.     Now, Josh, can you explain to the judge a little bit,

15  because I know you're -- in the military, you're all using

16  acronyms --

17  A.     I'm sorry.

18  Q.     -- so try and let him understand.  So that PSD

19  detachment, can you explain to the judge what that -- those

20  duties are?

21  A.     It's pretty much the military version of the secret

22  service, Your Honor.  You're kind of like bullets punch.  You

23  pretend you're assigned a principal, and you protect them,

24  and pretty much you follow them everywhere around; you're

25  their bodyguard, pretty much.

```
 1   Q.    Now, Josh, you arrived in Ft. Polk in 2011, you said?
 2   A.    Yes, sir.
 3   Q.    So that was your first and only duty station; correct?
 4   A.    Yes, sir, minus deployments.
 5   Q.    Minus deployments and boot camp, et cetera.
 6              So you were in the Army for about six years;
 7   correct?
 8   A.    Yes, sir.  About that.
 9   Q.    Okay.  What was your rank at the time of the incident?
10   A.    Sergeant.
11   Q.    Were you a -- were you up for staff sergeant, or
12   shortly thereafter would be --
13   A.    I was a few days away from my promotion board for
14   staff, but I was also in the period of trying to switch over
15   to CID, doing an award program.
16   Q.    Okay.  And was it your intention to make the Army a
17   career?
18   A.    Yes, sir.
19   Q.    In some law enforcement capacity.
20   A.    Yes, sir.
21   Q.    Let the judge know, what type of military awards,
22   decorations, did you receive during your service?
23   A.    I've had all kinds of awards, Your Honor.  From --
24   everything from six or seven Army achievement medals, to Army
25   accommodation medals, good service medals.  I've had oversea
```

1    ribbons.  A couple of awards while I was deployed.  I

2    received NCO of The Year for our battalion.  I received

3    Soldier of the Year for our battalion.  I went up through

4    different courses.  I was kind of a competitor.  I always

5    wanted to better myself and my career.

6    Q.    All right.  Now, with that, I want to -- I want to

7    circle you back to the date in question, that April 12th of

8    2017.  What was your assignment that day?

9    A.    That day, and actually that week, I was -- I was like

10   the only senior detective at that time, or investigator at

11   that time, in that office.  So I was overseeing everyone's

12   calls just to -- because we were training them.  We were --

13   just went through a switch of investigators.  And I was a

14   senior there, so I was over-watching Zalewski and the office,

15   pretty much, that day.

16   Q.    Okay, Josh.  And tell the judge what happened that day,

17   from your perspective.

18   A.    Yes, sir.  So, Your Honor, that morning, I was out

19   running down leads and getting coffee for the office, like we

20   do in the mornings.  I get a call from Mike George, which is

21   our boss, saying that I need to get to the station; that we

22   had a walk-in complaint of two soldiers that came in, and

23   they witnessed an individual out in the woods, which is a

24   military training area -- we call it Rosepine 2 -- and that

25   he was setting off some kind of explosive device.  There was

1    a loud noise.  And they were actually within the vicinity

2    doing a land nav, land navigation course, at the time.

3    Q.    Okay.  What, if anything, did you do at that Rosepine

4    area?

5    A.    At that moment, we were still at the -- we got that

6    call and we were told that he was approached, and they --

7    that he -- that Mr. Taylor had told him that he had a weapon

8    on him at that time.

9    Q.    So you got a call from other soldiers that had been at

10   that training range; correct?

11   A.    Yes, sir.  They came in --

12   Q.    So there were -- there were personnel there when the

13   device --

14   A.    Yes, sir.  They made a -- they came in right to the

15   station afterwards, after Mr. Taylor left the scene, and made

16   the report.  And so we -- our report was we have the possible

17   armed and dangerous individual who fled an area after setting

18   off an explosive devise.

19   Q.    Okay.  And so what did you do next?

20   A.    Being one of the head leaders of the SWAT team, I had

21   to notify my guys we have a possible armed and dangerous guy

22   headed towards post.  I had my team pulled up and ready, just

23   in case.

24         And also, I was the senior investigator that day,

25   so I also was working -- it was Zalewski's duty day, so it

1    was kind of both the team work, let him call the shots, just

2    give him time to run.  And I've been at Ft. Polk the longest,

3    pretty much, of all the soldiers there, so I knew the area

4    well.

5            They're like, with your experience and also you --

6    we got to have someone check it out.  And you're also on

7    duty.  You're the man to go.  And because they said where it

8    was, and I knew exactly where it was, and that -- excuse me,

9    I didn't have to use a map or anything.

10           So we waited on EOD, contacted bomb squad, and

11   waited on them, and we escorted them out to the site at

12   Rosepine 2 off of LA-10.

13   Q.    Okay.

14   A.    Excuse me.  So after that, Brandon and a few other

15   officers, we had patrols, we started going over gate cameras,

16   had dispatch looking over everything, trying to find out

17   where this vehicle was.  We found out what gate he left out

18   of, using our cameras off of the gates and everything, and

19   found out he actually came around through the north end of

20   post.

21           We finding this out, roughly, as I'm heading out to

22   the scene.  I get out there and make contact with -- I forget

23   the individual's name, but it was the staff sergeant out

24   there that was part of the training unit.

25   Q.    Okay.

1   A.    And pretty much told me exactly what the two came into

2   the station had told us, that they witnessed an individual

3   setting off an explosive device.  They tried to confront him.

4   Found out he had a loaded weapon.  And he left.

5   Q.    Okay.  So now, you have -- after you've spoken with the

6   staff sergeant, what happens after that?

7   A.    Right then and there, we kind of get everyone to back

8   off.  I'm out there with EODs.  We're trying -- they didn't

9   know exactly where it went off because they were over -- it's

10  kind of like a ridge.  So they -- once they heard the noise,

11  that's when they sparked interest, they went and looked and

12  saw him leaving.  So they knew exactly where it went off.

13  Q.    Okay.

14  A.    So we had to walk around and look.  Myself and the EOD

15  was out there.  And we kind of got a faint smell.  We really

16  wasn't sure.  Because, I mean, out there, everyone trains, so

17  it just -- it smells around Ft. Polk.

18         So we didn't know, really, what was going on until

19  we start looking at our feet and looking at the grass.  And

20  we come across.  And there was a training Conex, like a

21  little metal building, on the left as we were approaching

22  from the west side of the training area.  And we saw a spot

23  that looked like a blast site.  There was foamy substance in

24  the middle.  You could see it sizzling and everything.  I had

25  no idea what the -- what it was at all.

1   Q.    Okay.  So when y'all see that, does EOD respond to the

2   scene or to the -- to that specific part of the training

3   ground?

4   A.    Yes.  So at that moment, yes, being a detective

5   investigator, we have to, you know, take care of the crime

6   scene, protect it and everything.  But for safety measures,

7   because it was, we -- I asked EOD to check it.  They had a

8   scanner.  I didn't know what kind of scanner it was, whether

9   it was a radiation scanner or not.  I used my pocket knife,

10  scooped it up, put it on the tester, and said it was --

11  seemed it was safe.

12  Q.    Okay.  So after that, did you started investigating the

13  scene or --

14  A.    Yes, sir.

15  Q.    -- conducting your examination?

16  A.    So I had everyone back off.  We got a safe cordon, just

17  so to make sure nothing was contaminated, evidence was ruined

18  and anything like that.  Did a 360 photography of the entire

19  scene.  Started taking pictures and measurements of the area

20  and everything else.

21           And it was about -- at that time, it was roughly

22  about a four-foot blast radius at that time.  Then I started

23  to collect gravel around there because I noticed it was

24  starting to turn yellow.  And once I put one of the pieces of

25  evidence in a bag, I didn't even seal the bag.  Because

1    normally, the evidence bags, you seal them.  I just kind of

2    folded it over for a second so I could mark it in a second.

3    And the bag ended up blowing up within two seconds of me

4    turning around.

5    Q.    So then after that happens, what are your steps?

6    A.    At that, I was like kind of weird, looked at the EOD

7    and said, are you sure this is safe?  He said it should.  And

8    then we look around.  And as, you know, I'm sitting here

9    taking samples, the ground starts changing colors; it went

10   from green grass, normal gravel to you could watch the grass

11   start turning brown within an area.  And I looked down.  And

12   I started getting heavy breath and, guys, this smells weird.

13   And that's when we were like -- I started getting dizzy,

14   lightheaded.  I said, guys, we got to -- we called dispatch,

15   called HAZMAT out.

16   Q.    What, if anything, did you notice about your gloves?

17   A.    At that time, my hands were itching and burning.

18   Looked down, and like my latex gloves, they're really just

19   started to deteriorate, they started melting away, pretty

20   much.

21   Q.    Okay.  So at that point, when you all back off, does

22   HAZMAT come?  What happens next?

23   A.    Okay.  So we contact dispatch and Chief Lungren on

24   what's going on.  And we get a clear cordon about 3 - 400

25   yards away from it, as best we could.  And then I go back

1    trying to get reports, trying to contact with HAZMAT, as

2    well, make sure we got safe areas, where to come.  And also

3    talked to the chief and all the higher-ups that are trying to

4    come out there and see what's going on, also.  Because at

5    this point, we're like, well, what the heck's going on.

6              And then at that time is when I got really dizzy.

7    I had to sit down in the back of the tailgate of the truck,

8    and I ended up kind of passing out for a second.

9    Q.    Okay.  And then do you subsequently get decontaminated

10   at the station or on the scene?

11   A.    So my partner, Matt Seegers, comes up.  He was kind

12   of -- he was one of the investigators, but also works in game

13   enforcement, so he was out there as a ride-along.  Excuse me.

14   And he comes up to the truck, checks on me and he says, hey,

15   you're kind of out of it.  Wakes me up.  HAZMAT comes out.

16   They're staged on LA-10, which is the highway that runs past

17   the training area.

18             So we have to walk a ways around the area radius

19   just to be safe because we knew it was chemical.  And we get

20   to LA-10.  They break out the fire hoses on the truck, they

21   strip us down naked, and decon us on the side of the road at

22   that moment.

23   Q.    Okay.  And then are you subsequently brought to the

24   hospital?

25   A.    Yes, sir.

Q.    Okay.  What happens at the hospital?

A.    We arrive at the hospital.  And at that time, we find

out that they're at the library working the car; that they

found the car and everything.  And we're both like, hey, we

got to get back.  But we weren't feeling as well.  They took

our vitals and everything at the hospital at first and

noticed that -- they were like, oh, you got a little

shortness of breath.  Everything seems okay.  If you have any

issues later on, please come back.

Q.    Okay.  So then you leave the hospital; correct?

A.    Yes, sir.

Q.    And you go back to the office?

A.    I go back to the office to change because I had

absolutely no clothes.  They took my tactical pants, my pull

over, my boots.  My boots were ruined, like the bottoms of

them.  That chemical got on them, so they were just -- they

were trash.

      I decided to go change.  And then once I got

changed, I got called out to the new command center at the

library where they had HAZMAT set up for evidence transfer.

Q.    Okay.  And what happens when you're over there?

A.    We got there.  Everyone's kind of -- they got

everything cordoned off.  We were just trying to get

accountability of all our equipment.  Like I had to pass off

my weapon.  We had to pass off cars.  There was a bunch of

```
 1   stuff missing, and we just wanted to make sure everything was
 2   accounted for, as well.  So I was involved in helping
 3   transfer the evidence back to the station so we could process
 4   it and make sure everything was documented correctly.
 5   Q.    Okay.  And tell the judge what do you -- what's going
 6   on after that?
 7   A.    Okay.
 8   Q.    You leave the library area; correct?
 9   A.    So we leave the library and we get back to the office,
10   Your Honor.  And we start processing it.  I was starting to
11   feel a little sick, lightheaded.  Pass it on to one of the
12   other detectives there, and he was our evidence custodian.
13   So he was going through it with the desk sergeant, making
14   sure that everything was annotated correctly.
15          At that time, I didn't know that those pieces
16   possibly were contaminated, as well.  Then I started to get
17   dizzy and my chest starts clenching, burning.  I couldn't
18   breathe.  My throat was swelling up.  And I kind of get
19   dizzy.  And my deputy chief, Jack Bolder, takes and says, you
20   got to go back to the hospital.  So he took me back to the
21   hospital.
22   Q.    Okay.  So this is the second time you're going to --
23   A.    Yes, sir.
24   Q.    -- the same hospital.
25   A.    Yes, sir.
```

1    Q.    Okay.

2    A.    About two hours after release.

3    Q.    What happens when you go to the hospital the second

4    time?

5    A.    They started to admit me.  I went in there.  They put

6    me on a breathing treatment.  And my blood pressure was high.

7    My vitals were pretty high.  And there -- they were just

8    curious because we didn't know what the chemicals were.  It

9    took us a while to figure out what the chemicals were.  So

10   they didn't know really how to treat it.

11          Just they were treating for, you know, a normal

12   you-can't-breathe or whichever and -- I'm sorry.  After that

13   it was kind of they were wanting to admit me, but they're

14   really not sure.  And they -- an investigator and everything,

15   you got a big case coming up.  I mean, any law enforcement

16   officer in here will agree you get some cool stuff, you want

17   to do your job.  There is some stuff that sucks, but there is

18   some stuff you live for when you're a law enforcement

19   officer.  You want to work the cool stuff.  You want to do

20   this.  You want to do your job.  You just don't want to sit

21   back and let, you know, other people get hurt or anything

22   like that.

23          And so it was kind of a -- not really an argument,

24   but the doctor was like, hey, and my boss vouched for me.  He

25   said, if he gets worse, we'll bring him back and we'll keep

1    an eye on him.  But I had to get back to the office and make

2    sure that everything was fresh in my mind.  I had to type

3    reports.  I had to give statements.  Had to make sure my guys

4    were okay, because, I mean, half of them were at the

5    hospital.

6    Q.    Okay.  So you leave the hospital again and go back to

7    the office?

8    A.    Yes.  When I stepped into the hospital -- headed back

9    to the office, and that's when Taylor was brought into BJACH,

10   and that was the first time I actually saw him.  And one

11   thing that bugged me was the look.  He had a smile on his

12   face, and laughing as my fellow agents and investigators were

13   getting decon'd outside of the hospital.  They were all

14   stripped down of clothes, getting sprayed off, and we bring

15   in -- the other officer is bringing in Taylor to get decon'd,

16   and he's kind of making a joke out of it.  That hit us pretty

17   hard, that smiling and laughing just, for someone who wanted

18   to -- not meant to hurt anyone, kind of seemed happy about it

19   is what it seemed like at that point.

20   Q.    All right.  So you leave the hospital.  You go back to

21   your office, and you're typing up your reports; right?

22   A.    Yes, sir.  So staying at the office that night for a

23   while.  Left home to get a change of clothes.  Came back.

24   Had blotter brief in the morning, just because it was a big

25   incident and we all had to be there to tell our stories.

```
 1              And I was the lead guy at the scene at the moment,
 2      at the blast site.  So I was there.  We went out with -- I
 3      went out with Agent Hindiger, I believe, with CID.  And we
 4      went to go -- we were told that somehow through all this,
 5      there was another device or container that was ditched out of
 6      the car.
 7              So we went -- we were trying to search the area,
 8      trying to find that container.  We found it about a quarter
 9      mile outside of the original blast site on the side of LA-10.
10      Q.    Okay.  Now, at some point, you're -- you go back to the
11      hospital; correct?
12      A.    Yes, sir.
13      Q.    In fact, you get admitted to the hospital.
14      A.    Yes, sir.  So there was about -- I come back to the
15      office, and chief gets onto me and Investigator Zalewski
16      about being at work, because everyone else got like four-day
17      quarters and we're out there working.  He says, no matter
18      what, he like you can type your statement at home.  He's like
19      if you have anything in your mind, call us and tell us, but
20      you got to go home and rest.  So the department sent us home
21      to rest.
22              It was about -- it was rough.  I was in and out of
23      the doctor each day just checking vitals.  They had us come
24      back every now and then and check with the victim's council
25      and everything.
```

1          And the breathing got worse, Your Honor.  Um, it

2    was hard to sleep.  And then about -- it was probably about a

3    week later, I was still going to the doctor.  I was assigned

4    one doctor, in the beginning, that put me on medical

5    steroids, everything.  He was trying to fight the infection.

6    Because we didn't even know what the chemical was.

7          And then about a week after the incident -- I live

8    about -- at that time, I lived about 30 minutes outside of

9    post where there's no cell service, just a nice place to get

10   away.  And I had a roommate at the time.  And woke up in the

11   middle of the night and wasn't able to breathe.  I couldn't

12   find my inhaler.  I couldn't walk.  Couldn't get to my phone.

13         And my roommate comes in and checks on me, rushed

14   me to BJACH, and that's -- when they took me there, they

15   contacted my doctor who was on call, and found out that my

16   lung had collapsed and that my throat was also collapsed, as

17   well.

18   Q.    All right.  So what do they do as a result?  Like how

19   long were you in the hospital?

20   A.    I was in the hospital for about six days.  Continuous

21   breathing treatments.  I was hooked up to a breathing machine

22   for a while.  Different steroid treatments, pain killers.

23   Everything I could, just to -- my blood pressure was high.

24   It was painful breath.  It was just the pain, dealing with it

25   was the hard part.

1          And they let me go about a week later, and just

2    because they still don't know what kind of chemicals this is.

3    We're working with CID and labs trying to -- if you ever

4    worked with a lab, you know it takes a while to find out, get

5    results back.  So we had no idea exactly what chemicals were

6    in there, minus the chlorine packaging we found.  So no

7    doctor really knew how to treat it -- excuse me, at that

8    moment just because it's not an everyday injury, you know.

9          So time goes by.  And it gets worse, breathing gets

10   worse.  I had to do some breathing tests.  And the first

11   test -- I couldn't complete a breathing test if I tried, the

12   first month or two.  And then, finally, once I completed a

13   test, it came back to like -- in the beginning, I was like

14   20 percent lung capacity, 25 percent lung capacity, to where

15   it showed in my everyday.  I couldn't breathe.  Couldn't do

16   much.  Sleep was an issue.  I was terrified to go to sleep

17   just because --

18   Q.    Why were you terrified to go to sleep?

19   A.    I had damage, nerve damage.  It controlled -- so the

20   chemicals chemically burned the entire of my throat and in my

21   chest to where it damaged the nerves that run how your vocal

22   cords move in the back of your throat when you breathe.  So

23   your brain has a nerve that tells you to breathe correctly.

24   Where your vocal cords are supposed to act normal, mine were

25   compromised and acting backwards.  So any amount of stress

```
 1    that triggered a nerve, and my throat would just close up, or
 2    my cell phone would be able to tell me to breathe, Your
 3    Honor --
 4    Q.    All right.
 5    A.    -- and I'd wake up.
 6    Q.    I'm sorry.
 7    A.    No, go ahead.
 8    Q.    As a result of what happened here, did you have to have
 9    certain surgeries?
10    A.    Yes, sir.
11    Q.    Tell the judge about that.
12    A.    Back in November, I had a full throat reconstruction
13    surgery and a tissue transplant on my throat.  They went
14    through and they pretty much scraped all the dead, infected
15    tissue out of my throat and vocal cords.  They did injections
16    into my vocal cords, trying to fix them, trying to get them
17    to act better.  It was just a temporary thing just to see if
18    it worked, because it was -- I was like a lab rat.
19              Like no one knew really what the damage was, except
20    I couldn't breathe and I had a lot of chemical burns and scar
21    tissue.  And so they tried the surgery.  They went into my
22    throat, they scraped it.  And they did biopsies of my lungs.
23    They couldn't open my chest.  They were talking about opening
24    my chest, but they were afraid the chemicals would spread
25    because I still had chemicals in my lung.  And I still, to
```

1    this day, still have chemicals in my deep lung area due to my

2    lungs can't operate correctly because my throat's not fixed

3    yet.  They have to fix my throat so my lungs can properly

4    function to be able to push that air out.  And so to this

5    day, I still deal with it.

6           And I've had other procedures to where since they

7    can't go in, it's painful, they have to like separate my jaw

8    when they go down my throat.  And they also have to send

9    scopes up my nose and stuff them down my throat, almost every

10   throat appointment I go to, just to see if the damage has

11   gotten worse or if they're still acting backwards.  And it's

12   about every single time I go.

13   Q.   And as a result of this injury or a result of this

14   incident, would you say that's why you were medically

15   retired?

16   A.   Yes, sir.  It's a fact that I was in physical --

17   physical peak of my life.  I was a go-getter.  I worked out

18   every day.  I ran every day.  I could run five miles -- I

19   could run a two-mile in eleven minutes.  And now I can -- I

20   joke it about it all the time, but it's true.  I can barely

21   walk to my mailbox without getting winded.  There is no more

22   working out.  There is no more any outdoor activities.  There

23   is -- there's nothing.  My life is gone.

24           That -- it's -- you need to breathe to be able to

25   live, and it's very difficult.  And -- excuse me.  I would

1   say that the injury -- that injury was -- I had no injuries

2   before, and that's one that pushed me to retirement.

3   Q.    What about like common illnesses?  A common cold?  Does

4   that have a negative effect on you?

5   A.    Yes, sir.  So anytime I get sick, I have to go to the

6   ER, I have to go to the hospital.  Because even puking,

7   coughing, any aggravation, is a stress inducer that causes --

8   the damage I have to my nerves that activate my throat,

9   causes me to go to the hospital.

10          Breathing attacks.  You can ask -- my girlfriend's

11   lived with me for the past -- since the incident.  She's the

12   one that deals with it the most.  She -- she's woken me up

13   two, three times in the middle of the night because I can't

14   breathe or I'm tossing and turning and choking.  She has to

15   run and try to get my inhaler.  She's on me 24/7, trying to

16   make sure I'm still breathing.

17          There's times I didn't even realize, in the middle

18   of the night she's taken me to the hospital because I can't

19   breathe and living in fear that am I going to wake up the

20   next day.

21   Q.    Josh, as best you can, try and explain to the judge how

22   this -- the effects or the after effects of this incident has

23   impacted your life.

24   A.    Yes, sir.  So, Your Honor, like we said in the

25   beginning, I wanted to make a career out of the military.  I

```
 1   busted my butt the best I could to be -- to have a good
 2   future.  I wanted to do 20 years.  I wanted to leave the
 3   military.  I wanted to go FBI.  I was working towards it.  I
 4   was about to apply.
 5           I was in the process of applying for CID and
 6   switching my career.  I did every extra schooling you can
 7   think of.  And I was good at it.  I loved my job.  And that
 8   injury -- Sergeant Joshua Farbro does not exist anymore, he
 9   was killed that day, that he is no longer in life.  That I am
10   a brand new person now.  It's rough.  It sucks.  But that man
11   does not exist.  And from what doctors say, if I don't -- if
12   they can't figure out how to fix me, that the new guy won't
13   exist much longer either.
14           MR. MCCOY:  I have no further questions, Your
15   Honor.  I tender.
16           THE COURT:  Mr. Blanchard?
17                   CROSS-EXAMINATION
18   BY MR. BLANCHARD:
19   Q.   Mr. Farbro, I'm so sorry about what happened to you,
20   but I do have to ask you a few questions.
21   A.   Yes, sir.
22   Q.   First of all, I think you initially said that the
23   people who were out there doing the training had seen
24   something.  But if I understand your subsequent testimony,
25   they didn't see anything; they heard something.
```

1   A.    Correct.  They heard and went and observed, and saw

2   what appeared to be someone -- this was just the original

3   call we got from dispatch.  And that they walked in and that

4   they saw the individual in the vehicle, and that they saw

5   what was to be.

6   Q.    After they heard something.

7   A.    Yes, sir.

8   Q.    And apparently went in that direction to see what it

9   was that they had heard.

10  A.    Yes, sir.

11  Q.    Because this was a training area.

12  A.    Yes, sir.  A training area you're not supposed to be

13  in.

14  Q.    And I'm supposing that they had the right or the

15  permission, or whatever, to use the training area on that

16  day.

17  A.    The unit that was out there, yes, sir.  You have to

18  reserve those areas through a long process to be able to use

19  them.  And they're actually not supposed to be out there

20  while the units are there.  There's actually -- they have

21  road blocks and little barricades up that say do not enter.

22  Q.    And you said that they were apparently behind a ridge.

23  So they couldn't really see anything until they crossed the

24  ridge?

25  A.    From what I was told, yes, sir, that that training

1    area's all hilly.  It's land nav.  It's going to be, you

2    know, different.  You learn the terrain.  So the terrain's

3    all crazy there.

4    Q.    Did you take the photos that were taken out there that

5    day?

6    A.    Yes, sir.

7              MR. BLANCHARD:  Can I approach, Your Honor?

8              THE COURT:  Sure.

9    BY MR. BLANCHARD:

10   Q.    So, Mr. Farbro, would you look at those photos and see

11   if those are actually photos that you took.

12   A.    No.

13   Q.    They are --

14   A.    These are not my photos.

15   Q.    Do you recognize those photos?

16   A.    I recognize the area, but the red tape was put up

17   after --

18   Q.    Okay.

19   A.    And I was in the hospital, because we didn't -- I was

20   gone before the red tape was even put up.  So I can tell you

21   right now, I did not take these photos.

22   Q.    Okay.  But again is this the area?

23   A.    Yes, sir.

24   Q.    And apparently, I see one, it says something in

25   English, but also Arabic?

```
1    A.    Roger.  That's -- they have different names for each

2    training area, and that was Zarange.

3    Q.    Zarange, okay.

4          MR. BLANCHARD:  And I'm going to mark this

5    Defendant's Exhibit 1.

6                         (Defendant's Exhibit 1 was

7                          marked for identification.)

8    BY MR. BLANCHARD:

9    Q.    So Defendant's Exhibit 1, would that show where you

10   would enter the area?

11   A.    You could.  There is about four different ways to get

12   in that area, but that is one way you --

13   Q.    That's the way y'all entered, apparently.

14   A.    Yes.

15         MR. BLANCHARD:  Okay.  And I'm going to mark this

16   one Defendant's Exhibit 2.

17                         (Defendant's Exhibit 2 was

18                          marked for identification.)

19   BY MR. BLANCHARD:

20   Q.    Now, you mentioned this happening around a training

21   building.  So is this the building where the weapon was set

22   off?

23   A.    Permission to use your pen?

24   Q.    Sure.  And I was going to --

25   A.    Can I draw on it?
```

```
 1   Q.    Yeah.  Can you mark it or --

 2   A.    Yeah.  So --

 3   Q.    Okay.

 4   A.    So like I say, I believe this -- these pictures look

 5   like they were taken the next day.

 6   Q.    Okay.

 7   A.    I'll show you.  You can see the blast area right there.

 8   I'll circle it right now.  It was right in front of that

 9   Conex.  And you can see that brown in the grass --

10   Q.    Okay.

11   A.    -- in the concrete where it's stated in my statement.

12   Q.    And that's on Defendant's Exhibit 2.

13             THE COURT:  You can come up.

14             MR. BLANCHARD:  And I'm going to mark this

15   Defendant's Exhibit 3.

16                       (Defendant's Exhibit 3 was

17                        marked for identification.)

18             THE COURT:  That was the...

19   BY MR. BLANCHARD:

20   Q.    Now, you mentioned another container being found.

21   Would that appear to be where it was found?

22   A.    There is really no -- I mean, from this picture, I

23   can't tell because I don't know how far away it is --

24   Q.    Yes.

25   A.    -- from the actual exit of the training area.  If this
```

1   is a photo facing north, then it would be on this side.

2   Q.    Okay.

3   A.    Oh, excuse me -- yes, if it was facing north, it would

4   be on this side.  If this was a south-facing photo, it would

5   be on this side.

6   Q.    Okay.  But does that appear to be LA-10 to you?

7   A.    Yes.

8          MR. BLANCHARD:  Okay.  Again I'm going to mark this

9   Defendant's Exhibit 4.

10                        (Defendant's Exhibit 4 was

11                         marked for identification.)

12  BY MR. BLANCHARD:

13  Q.    And does that appear to be the same entry area that was

14  marked Zarange and had Arabic writing on it?

15  A.    It could be.  I'm telling you there's about a hundred

16  of these roads --

17  Q.    Okay.

18  A.    -- with those signs all over Ft. Polk.  So if, I mean,

19  I --

20  Q.    Do you know the motion training area?

21  A.    Yes, sir.

22  Q.    And they lead into woods?

23  A.    Yes, sir.

24  Q.    Okay.  And that's what it was.  It was a wooded area;

25  correct?

```
 1    A.    Yes, it was.

 2              MR. BLANCHARD:  And, finally, we're going to have

 3    Defendant's Exhibit 5.

 4                            (Defendant's Exhibit 5 was

 5                             marked for identification.)

 6    BY MR. BLANCHARD:

 7    Q.    Again does that appear to be the same entrance area,

 8    maybe taken --

 9    A.    Yes, sir.

10    Q.    -- a photo taken further back?

11    A.    Yes, sir.

12              MR. BLANCHARD:  Okay.  Your Honor, I would like to

13    introduce Defendant Exhibits 1 through 5.

14              THE COURT:  Any objection?

15              MR. MCCOY:  I have no objection, Your Honor.

16              THE COURT:  Okay.

17              MR. BLANCHARD:  Thank you, Mr. Farbro.

18              I don't have any further questions, Your Honor.

19              THE COURT:  Thank you.  Any redirect?

20              MR. BLANCHARD:  No, Your Honor.

21              THE COURT:  Thank you, sir.  You may step down.

22              Exhibits 1 through 5 admitted into evidence.

23                            (Defendant's Exhibits 1 - 5 were

24                             admitted into evidence.)

25              THE COURT:  Any other witnesses by the government?
```

```
 1              MR. MCCOY:  No, sir.

 2              THE COURT:  Okay.  Anything further by the defense?

 3              MR. BLANCHARD:  Yes, Your Honor.  Your Honor, I

 4    would just submit, you know, there's certainly no contest --

 5    and I've said it in my pretrial memo, and I've known for

 6    quite a while after looking at these gentlemen's medical

 7    records, that there is no contest about the four-level

 8    enhancement for serious bodily injury or death.  And we don't

 9    contest that.

10              You know, I do disagree, of course, with Your

11    Honor's application of the Guidelines.  But, you know, the

12    factual argument that I made, it still stands, no matter how

13    you apply the Guidelines; that this was something that

14    certainly was not intended, nor was it the purpose, Your

15    Honor.  And it's, obviously, why doing something like this is

16    illegal with chlorine or other chemicals, because of the

17    horrible injuries that these men suffered.  But it doesn't

18    change the fact that Mr. Taylor -- it's certainly an immature

19    act, but that he didn't intend it, Your Honor.

20              And, again in my presentence memo, I don't think

21    that there's any need for this sentence to protect or to

22    prevent Mr. Taylor from committing another offense.  I

23    don't -- I just don't see that happening, Your Honor.  He had

24    a fine record in the service, an exemplary record in the

25    service.  You know, no one had anything bad to say about him
```

 1    during the course of the extensive investigation that went on

 2    with this.  And I think there's very little chance that he is

 3    going to ever commit another offense, Your Honor.

 4              So with that in mind, I think that leaves Your

 5    Honor with promoting respect for the law.  And a five-year

 6    sentence, certainly any sentence within the Guideline range,

 7    would be more than enough to do that, Your Honor.  That's a

 8    significant sentence for a person this age, Your Honor.

 9    Thank you.

10              THE COURT:  All right.  Thank you.

11              Any response by Mr. McCoy?  By the government?

12              MR. MCCOY:  Briefly, Your Honor, if I may.  And I

13    would just like to talk in somewhat of a rebuttal from

14    Mr. Blanchard's well-written sentencing memorandum as it

15    relates to this case.

16              Your Honor is well aware this is a difficult

17    matter.  You have the life of at least one individual is

18    forever changed, and that's not disputed here today.  And

19    it's, obviously, your duty, as the judge, then, to fashion an

20    appropriate sentence under the sentencing factors, under the

21    3553(a) factors.

22              But I would like to just kind of draw some of your

23    attention, in rebuttal to Mr. Blanchard's sentencing

24    memorandum, and I would like to do that by just kind of

25    walking you through some of the items that were already

1    submitted -- or not already, they are submitted within the

2    PSR, because I think that will help in your determination of

3    an appropriate sentence.  So I just wanted to highlight a

4    couple of facts that are not disputed between the parties as

5    to what happened on that date, April 12th of 2017.

6            Obviously, you've already heard the testimony of

7    Mr. Zalewski and Mr. Farbro, to kind of get an idea of what

8    happened on that day.  So you almost already have a real-time

9    play-by-play from these two investigators, one at the scene

10   where the Conex boxes were on the training range, and then

11   one where the vehicle was found over at the education center

12   on Ft. Polk.

13           But I do want to draw your attention back to that

14   Pretrial Services Report where the soldiers that made the

15   report mentioned that they had heard noises described as

16   small arms fire or firecrackers.  They identified the

17   direction of the noise.  They observed a soldier near a

18   four-door sedan with the trunk open, doing what appeared like

19   he was filming something.

20           They approached that soldier, according to the

21   reports, and he said that he was setting off fireworks.

22   Those individuals had mentioned they could smell a

23   bleach-like odor in the air.  So at that point, obviously,

24   the agent has been released into the air.  They also noted

25   other containers.  And that when they approached him, he said

```
 1    his name was Sergeant Murphy, not Specialist Taylor, as he

 2    was at the time.

 3            When those investigators from Ft. Polk arrived to

 4    the site of the explosion, and Mr. Farbro began gathering

 5    their samples, that's where you had the injuries.  And he's a

 6    hundred percent disabled.  He's medically retired.  You know,

 7    as he eloquently stated today, his -- that Sergeant Farbro's

 8    life ended that day for all intents and purposes.  And there

 9    is a new man, but that new man is going to have

10    significant -- significant health issues for the rest of his

11    life.  You also heard the testimony of Mr. Zalewski, so I'm

12    not going to reiterate that.

13            But I do want to also draw your attention when the

14    Pretrial Services Report mentioned about the searches of

15    Taylor's off-post residence where they found other possible

16    explosive-type devices, one that was disrupted with a

17    percussion-activated nonelectronic dispose -- disruptor that

18    did not have other explosive material, but was detonated.

19            And that the search warrant obtained at a storage

20    unit had a notebook that contained numerous handwritten

21    notes, and apparently, you know, instructions, on how to

22    manufacture IEDs.  As well as the mention of what was found

23    on his cellular phone when it was searched, with search

24    history terms indicative of the incident that we had, leading

25    to what we've got today.
```

```
 1              So I do want to just draw that to your attention
 2      kind of in rebuttal to what Mr. Blanchard said that, you
 3      know, he's -- it's a gross negligence here.  But, you know, I
 4      think it might be a little bit more than that.  I think the
 5      record shows that out.  And, you know, it -- the record I
 6      believe in front of you shows at least preparation and
 7      planning.
 8              And, you know, you've seen the facts.  You've heard
 9      the testimony.  And the government is absolutely confident
10      that you're going to fashion an appropriate sentence here for
11      this matter.
12              THE COURT:  I do note in the record that the
13      government is not requesting an upward departure; is that
14      correct?
15              MR. MCCOY:  That's correct, Your Honor.
16              THE COURT:  All right.  My guess is the government
17      has not done that because, quite candidly, I considered doing
18      that on my own sua sponte based on the -- I was inclined to
19      do that based on the condition of the victims.
20              My guess is the government took into consideration
21      that the defendant in this case, albeit doing a horrible
22      thing with drastic consequences, served in Afghanistan for
23      two tours of duty.  And my guess is the government took that
24      into consideration in not moving for an upward departure.
25              This whole matter is tragic.  Three incredible
```

1    careers have been ruined.  Obviously, the career -- the

2    careers of what I call them victims in this case, although

3    they were not characterized as victims in the presentence

4    report -- Sergeant Zalewski, as well as Sergeant Farbro, both

5    of them who wanted to be career military.  Sergeant Zalewski,

6    50 percent PTSD disabled; his skin issues as well; continues

7    on medication.  He was medically retired, so he was not able

8    to fulfill what his dream was that was to further serve our

9    country.

10         As it relates to Sergeant Farbro, we've heard him

11   testify as well.  And, of course, his life has been ruined.

12   As he specifically said, Sergeant Farbro no longer exists.

13   Sergeant Farbro has been very highly decorated, intended to

14   make the Army his career.

15         And again, in here in the defendant's statement, I

16   had no doubt that the defendant's statement was very sincere,

17   but, unfortunately, we have to, you know, suffer the

18   consequences of our acts.  Certainly, Zalewski and Farbro

19   suffered the consequences of the defendant's acts, as well.

20         So why don't you stand up here, sir, for

21   sentencing.

22         MR. BLANCHARD:  At the podium, Your Honor?

23         THE COURT:  Yeah, please.

24         Anything further, Mr. Blanchard?  And I've reviewed

25   everything you've submitted.  Of course, you've done a very

1    good job on behalf of your client.  It's tragic.  It's

2    tragic.

3              MR. BLANCHARD:  All I would say, Your Honor, is

4    that the things that Mr. McCoy highlighted in the presentence

5    investigation, there was nothing else that was illegal that

6    he could have been charged with.  Again, I think one thing

7    the investigation showed, other than that Mr. Taylor had a

8    good history before that, is that he had a very immature

9    interest in things that blow up.

10             THE COURT:  Which caused significant injury to two

11   innocent military men.

12             MR. BLANCHARD:  Yes.  And no contest about that,

13   Your Honor.  But again, I think he's learned his lesson.  I

14   understand that there's more than one thing that Your Honor

15   has to take into account in sentencing, but I think all of

16   the facts, all of my interaction with Mr. Taylor indicates

17   that one thing you don't have to worry about is him ever

18   breaking the law again, Your Honor.

19             THE COURT:  Well, I'm glad to hear that.  But I

20   also cannot ignore the fact that we have these two military

21   men, no longer military men, disabled military men, who have

22   to live with, again, Mr. Taylor's illegal acts for the rest

23   of their life.  And although Mr. Taylor will never do again

24   what he did, these gentlemen will never be able to do again

25   what they did in the past, as well, through no fault of their

1    own.

2             I hear you.  And Mr. Taylor is going to benefit

3    from everything that I've heard you say, everything that I've

4    heard you argue.  His past military record, which I have no

5    reason to believe but for this was exemplary.  I see, you

6    know, two tours of duty in Afghanistan.  I've taken all of

7    that into consideration.

8             MR. BLANCHARD:  Yes, Your Honor.

9             THE COURT:  I've also taken into consideration the

10   surgeries performed on Mr. Farbro, you know, his lung and

11   throat had collapsed, nerve damage, burns, full throat

12   reconstruction, scar tissue, chemical burns.  Every time he

13   gets sick, he has to go to the emergency room.  Like Mr. -- I

14   did not ask Mr. Farbro this, but Mr. Zalewski, he served our

15   country in Afghanistan as well, Germany and Afghanistan, for

16   three years.  Nobody wins today.  Nobody wins today.

17            The Court, having asked the defendant why judgment

18   should not now be pronounced, and no cause to the contrary

19   appearing to the Court, and the defendant and attorney having

20   made statements on his behalf, the Court having review the

21   presentence report, and pursuant to the Sentencing Reform Act

22   of 1984 and after taking into consideration the testimony of

23   Sergeant Zalewski and Farbro, it is the judgment of the Court

24   that the defendant, Ryan Keith Taylor, is hereby imprisoned

25   for a term of 121 months -- I'm sorry, 135 months, which is

```
 1   the maximum under the Guidelines.

 2            His guidelines, as the Court has found be

 3   applicable, again over the objection of defense counsel, was

 4   108 to 135 months.  I feel the sentence at the top end of the

 5   Guidelines is appropriate in this case.  I am going to make

 6   recommendations that Mr. Taylor receive mental health

 7   evaluation and treatment; that he receive drug and alcohol

 8   treatment.

 9            Mr. Taylor, do you have any -- I'm sorry.

10            Mr. Blanchard, do you have any requests as to where

11   he is to be housed?

12            MR. BLANCHARD:  Well, he's from Michigan, Your

13   Honor.  And his mother, you know, couldn't even afford to

14   come down here.  That's really the only family he has.  So as

15   close to her home in Michigan as possible.  It's a rural

16   area.  What's the name of the town again?

17            THE DEFENDANT:  Ironwood.

18            MR. BLANCHARD:  Ironwood, Michigan, Your Honor.

19            THE COURT:  I'm going to recommend he be placed in

20   a facility as close to Ironwood, Michigan, as possible.

21            What type of trade would you like to take up?

22   Because I also make a recommendation for vocational training.

23   In what field?  Nothing related, obviously, to explosives.

24   Nothing related to any type of incendiary or --

25            THE DEFENDANT:  For automotive work or welding,
```

1    Your Honor.

2              THE COURT:  Okay.  I will make a recommendation

3    that he be placed in a facility that can provide vocational

4    training in automotive or --

5              THE DEFENDANT:  Welding, Your Honor.

6              THE COURT:  -- or welding.

7              Restitution is mandatory when there is an

8    identifiable victim who suffers injury or monetary loss.  The

9    Mona Lisa Apartments has requested restitution in the amount

10   of $6919, based on what it claims to be lost revenues due to

11   sharp decline in occupancy rate for two months, due to

12   Taylor's activities at the Mona Lisa Apartments.  The Court

13   finds that this is not a valid loss caused by the defendant,

14   and restitution is not ordered.

15             I did ask the sergeant how far away the Mona Lisa

16   was, and he said about two miles away.  I think that this

17   restitution request is much too speculative by the Mona Lisa

18   Apartments.  And they certainly have every right to proceed

19   in civil court if they choose to do so.

20             The Court finds that the defendant does not have

21   the ability to pay the fine.  Therefore, the Court will waive

22   the fine in this case.

23             Upon release from imprisonment, the defendant shall

24   be placed on supervised release for a term of five years.

25   Within 72 hours of release from the custody of the Bureau of

1   Prisons, the defendant shall report in person to the

2   probation office in the district to which the defendant is

3   authorized to reside.

4          While on supervised release, the defendant shall

5   cooperate in the collection of DNA, and he shall comply with

6   the mandatory standard conditions of supervised release.

7          There is a $100 special assessment which shall be

8   due immediately.

9          The Court has considered the Guidelines.  The

10  guideline range does exceed 24 months.  The Court finds no

11  reason to depart from the guidelines.

12         Several officers were decontaminated and medically

13  treated following exposure to the chemical reaction caused by

14  the defendant.  Sergeant Joshua Farbro is designated

15  100 percent disabled by the United States Army and Veteran's

16  Administration due to the injuries he sustained.  He's also

17  had surgeries as a result -- life-altering surgeries as a

18  result of this incident.

19         Sergeant Brandon Zalewski has also been medically

20  retired, and he continues to have ongoing effects from this

21  incident.

22         Mr. Taylor is a 24-year old man who has served in

23  the United States Army with no prior criminal history.  And

24  as I stated previously, the only reason why the Court is not

25  sua sponte going above the guideline range by way of an

1    upward departure is because of the fact that Mr. Taylor did

2    serve our country in Afghanistan.

3            The Court has accepted the Plea Agreement because

4    it is satisfied the agreement accurately reflects the

5    seriousness of the actual offense behavior and that accepting

6    the Plea Agreement will not undermine the statutory purposes

7    of sentencing.

8            The Court having pronounced sentence, does counsel

9    for the defendant or the government have any objections to

10   the sentence or to the manner in which the Court pronounced

11   sentence other than the objection previously stated on the

12   record?

13           Any further objections, Mr. Blanchard?

14           MR. BLANCHARD:  No, Your Honor, only to the

15   application of the guideline, as you further ruled on -- or

16   earlier ruled on, sorry.

17           THE COURT:  Thank you.

18           Mr. Joseph, any --

19           MR. JOSEPH:  No objection from the government, Your

20   Honor.

21           THE COURT:  All right.  Thank you, sir.

22           Mr. Taylor, sir, to the extent permitted by your

23   plea agreement, you do have the right of appeal from the

24   judgment and sentence within 14 days from this date.  Failure

25   to appeal within the 14-day period, shall be a waiver of your

1    right to appeal.

2            The government may file an appeal from this

3    sentence, as well.

4            Mr. Taylor, sir, you're also advised that you are

5    entitled to assistance of counsel in taking an appeal.  If

6    you're not able to afford a lawyer, one will be provided for

7    you.  If you're not able to afford the filing fee, the Clerk

8    of Court will be directed to accept Notice of Appeal without

9    such fee.

10           Any further motions by the government?

11           MR. MCCOY:  Yes, Your Honor.  At this time, in

12   accordance with the Plea Agreement, the government would move

13   to dismiss case 17-cr-00230.

14           THE COURT:  So ordered.  Anything further by the

15   government?

16           MR. MCCOY:  No, Your Honor.

17           THE COURT:  Anything further by the defense?

18           MR. BLANCHARD:  No, Your Honor.

19           THE COURT:  Mr. Taylor, good luck to you.

20           THE DEFENDANT:  Thank you, Your Honor.

21           THE COURT:  All right.  And, sergeants, good luck

22   to both of you and God bless you.  Thank you for your

23   service.

24           (Adjourned at 11:10 a.m.)

25                       *    *    *    *    *

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4          I, Gayle Wear, Federal Official Court Reporter, in

 5    and for the United States District Court for the Western

 6    District of Louisiana, do hereby certify that pursuant to

 7    Section 753, Title 28 United States Code that the foregoing

 8    is a true and correct transcript of the stenographically

 9    reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                   Dated 25th day of October, 2018.

14

15                   /s/ Gayle Wear
                     GAYLE WEAR, RPR, CRR
16                   FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25
```